

# NUMBER 13-12-00089-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**HARRIS & GREENWELL, LLP,**                                      **Appellant,**

**v.**

**JENNIFER HILLIARD,**                                              **Appellee.**

## On appeal from the 117th District Court
## of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Perkes
### Memorandum Opinion by Justice Garza

Appellant Harris & Greenwell, LLP ("H&G"), a law firm, represented appellee Jennifer Hilliard in a proceeding to enforce alimony obligations allegedly agreed to by Jennifer's ex-husband, Bob Hilliard. After the representation concluded, H&G sued Jennifer for her failure to pay fees and Jennifer made various counterclaims. Following trial, judgment was rendered in favor of Jennifer. H&G now contends by eighteen

issues that the trial court erred. We reverse and render in part and affirm in part.

## I. BACKGROUND

Jennifer divorced Bob, a plaintiff's lawyer, in 1999. The couple executed an agreement incident to divorce under which Jennifer obtained rights to contractual alimony. Bob stopped making the alimony payments in 2001, contending that tort reform legislation had substantially reduced his income and made performance impossible. Jennifer hired attorney Ron Simank to represent her in a suit to enforce the alimony obligation. In January 2004, she hired attorney Jim Harris of H&G as co-counsel. There was no discussion of fees, rates, or the scope of representation, and no written fee agreement was executed.

Harris informed Jennifer that he previously represented Bob in a grievance proceeding before the Texas Supreme Court, but he advised Jennifer that the prior representation did not constitute a conflict of interest with respect to the alimony enforcement case. Nevertheless, more than a year after Jennifer retained Harris, Bob moved for Harris's disqualification as Jennifer's counsel based on the alleged conflict. The trial court granted the motion to disqualify. Harris, on behalf of Jennifer, then filed a petition for writ of mandamus with this Court challenging the disqualification order. We granted the petition and reversed the disqualification order, concluding that "the trial court abused its discretion in finding that the grievance proceeding and the spousal maintenance suit are substantially related." *In re Hilliard*, No. 13-05-223-CV, 2006 Tex. App. LEXIS 3514, at *10 (Tex. App.—Corpus Christi Apr. 27, 2006, orig. proceeding) (mem. op.) (setting forth that, "[t]o determine whether a lawyer should be disqualified for having represented the adverse party in an earlier suit, the court must decide if the two

2

suits are 'substantially related'") (citing *Metro. Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319, 320 (Tex. 1994)). Bob filed a motion for rehearing with this Court and a separate original proceeding in the Texas Supreme Court, both of which were denied.

The case returned to the trial court some two years and three months after the disqualification issue arose. At that point, Harris sought Bob's financial records and suggested to Jennifer that a forensic accountant, Scott Turner, be hired to serve as an expert in the alimony dispute. According to H&G, Jennifer was advised of Turner's involvement in the case but did not initially object. Subsequently, in late 2007, Jennifer began expressing concern about the fees being charged by H&G, including the fees associated with Turner's engagement.

While Harris continued to pursue financial discovery, Jennifer reached an agreement with Bob as to a settlement under which Jennifer would receive a total of $1.2 million, including $105,000 cash at closing. The terms were put in writing and executed by both Jennifer and Bob on July 1, 2008.

Up until that point, Jennifer had fully paid all fees billed by H&G, amounting to a total of more than $48,000. After the settlement agreement was signed, however, Jennifer refused to pay an additional $13,794.13 in outstanding fees billed by H&G. She claimed instead that the proper amount due was $6,819.63. H&G then sued to recover those fees, asserting breach of contract and quantum meruit. Jennifer counterclaimed for professional negligence, breach of fiduciary duty, fraud, and violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"). The professional negligence claim was dismissed during trial. After hearing the evidence, a Nueces County jury found: (1) Jennifer did not fail to comply with her

3

agreement with H&G; (2) H&G performed $9,723.88 worth of compensable work for Jennifer between January 3 and June 25, 2008; (3) H&G failed to comply with its fiduciary duty to Jennifer, causing Jennifer to suffer $18,213.31 in damages; (4) H&G failed to comply with its agreement with Jennifer, causing Jennifer to pay $7,500 in fees not authorized under the agreement[1]; (5) H&G knowingly and intentionally engaged in false, misleading or deceptive acts, as well as unconscionable acts, which caused Jennifer to suffer $3,500 in damages; and (6) H&G committed fraud against Jennifer, causing her to suffer damages of $6,000.

Both parties moved for entry of judgment; the trial court denied H&G's and granted Jennifer's. The final judgment awarded Jennifer fee forfeitures and damages of $43,491.67,[2] attorney's fees of $38,750, conditional appellate attorney's fees, and pre- and postjudgment interest. The trial court subsequently issued findings of fact and conclusions of law chiefly related to the propriety of fee forfeiture as a remedy. This appeal followed.

## II. DISCUSSION

### A. Anti-Fracturing Rule

By its first issue, H&G contends that the trial court erred in submitting Jennifer's breach of fiduciary duty, fraud, and DTPA claims to the jury. H&G asserts that these

---

[1] The judgment states: "Because Hilliard's breach of contract cause of action, when combined with the fee forfeiture ordered by the Court, would yield the greatest recovery to Hilliard, the Court finds that judgment should be granted on that basis."

[2] The trial court found that, due to H&G's breach of fiduciary duty as found by the jury, H&G should forfeit all but $4,637 of the $48,128.67 in fees previously paid by Jennifer for representation in the spousal maintenance suit. This amount—$43,491.67—includes $7,500 in fees found by the jury to be unauthorized by the parties' agreement and an "additional" $35,991.67 assessed due to the breach of fiduciary duty finding.

4

claims are "nothing but legal negligence claims under a different name" and therefore constitute impermissible "fracturing" of Jennifer's legal negligence claim.

### 1. Applicable Law and Standard of Review

The rule against dividing or "fracturing" a negligence claim prevents legal-malpractice plaintiffs from opportunistically transforming a claim that sounds only in negligence into other claims. *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 189 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *see Beck v. Law Offices of Edwin J. Terry, Jr., P.C.*, 284 S.W.3d 416, 427 (Tex. App.—Austin 2009, no pet.).

Courts have remarked on the inscrutable nature of this rule. *See Murphy v. Gruber*, 241 S.W.3d 689, 696 (Tex. App.—Dallas 2007, pet. denied) ("As is apparent from our review of cases, there is a lack of clarity in this area of the law."); *Deutsch*, 97 S.W.3d at 189 ("This is a difficult area of the law, and there are confusing statements in dicta in some of the cases."). Nevertheless, some principles may be gleaned from the case law. If the gist of a client's complaint is that the attorney failed to exercise the degree of care, skill, or diligence that attorneys of ordinary skill and knowledge commonly possess, then the legal malpractice claim is properly based on negligence and may not be fractured. *Riverwalk Cy Hotel Partners Ltd. v. Akin Gump Strauss Hauer & Feld, LLP*, 391 S.W.3d 229, 236 (Tex. App.—San Antonio 2012, no pet.) (citing *Aiken v. Hancock*, 115 S.W.3d 26, 28 (Tex. App.—San Antonio 2003, pet. denied); *Deutsch*, 97 S.W.3d at 189). Such a claim encompasses a cause of action based on an attorney giving a client bad legal advice or otherwise improperly representing the client. *Id.* (citing *Aiken*, 115 S.W.3d at 28; *Murphy*, 241 S.W.3d at 692–93). If, however, the claim is more appropriately classified as another claim, then the client can assert a

claim other than negligence. *Deutsch*, 97 S.W.3d at 189. For example, if the claim focuses on an attorney obtaining an improper benefit, as opposed to the attorney failing to adequately represent the client, then the claim may appropriately be classified as a breach of fiduciary duty claim. *Riverwalk Cy Hotel Partners Ltd.*, 391 S.W.3d at 236 (citing *Murphy*, 241 S.W.3d at 693; *Aiken*, 115 S.W.3d at 28).

"Whether allegations against a lawyer, labeled as breach of fiduciary duty, fraud, or some other cause of action, are actually claims for professional negligence or something else is a question of law to be determined by the court." *Riverwalk Cy Hotel Partners Ltd.*, 391 S.W.3d at 236; *Murphy*, 241 S.W.3d at 692. Our review of a decision on a question of law is de novo. *Riverwalk Cy Hotel Partners Ltd.*, 391 S.W.3d at 236. Texas courts routinely look to the factual allegations in the plaintiff's petition when addressing fracturing issues, whether those issues are raised in the summary-judgment context, at trial, or, as here, post-trial. *Beck*, 284 S.W.3d at 428 n.11.

In determining whether a complaint is a claim for negligence or something else, "we are not bound by the labels the parties place on their claims." *Id.* (citing *Murphy*, 241 S.W.3d at 697). "Regardless of the theory a plaintiff pleads, as long as the crux of the complaint is that the plaintiff's attorney did not provide adequate legal representation, the claim is one for legal malpractice." *Id.* at 428 (citing *Kimleco Petroleum, Inc. v. Morrison & Shelton*, 91 S.W.3d 921, 924 (Tex. App.—Fort Worth 2002, pet. denied)). Merely characterizing conduct as a "misrepresentation" or "conflict of interest" does not necessarily transform what is really a professional negligence claim into a fraud or breach of fiduciary duty claim. *Pak v. Harris*, 313 S.W.3d 454, 457 (Tex. App.—Dallas 2010, pet. denied) (citing *Murphy*, 241 S.W.3d at 697).

6

An attorney owes fiduciary duties to his client as a matter of law. *Id.* at 428–29 (citing *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988)). The term "fiduciary" refers to integrity and fidelity; thus, "the attorney-client relationship is one of the most abundant good faith, requiring absolute perfect candor, openness and honesty, and the absence of any concealment or deception." *Id.* (internal quotations omitted). Attorneys must, among other things, "render a full and fair disclosure of facts material to the client's representation." *Id.* (citing *Willis*, 760 S.W.2d at 645). To distinguish independently actionable breach of fiduciary duty claims against lawyers from those that sound in negligence, Texas courts have generally held that a breach of fiduciary duty claim focuses on "whether an attorney obtained an improper benefit from representing the client," while a negligence claim focuses on "whether an attorney represented a client with the requisite level of skill." *Beck*, 284 S.W.3d at 429 (citing *Murphy*, 241 S.W.3d at 693). Breach of fiduciary duty by an attorney most often involves the attorney's failure to disclose conflicts of interest, failure to deliver funds belonging to the client, placing personal interests over the client's interests, improper use of client confidences, taking advantage of the client's trust, engaging in self-dealing, and making misrepresentations. *Id.* (quoting *Gibson v. Ellis*, 126 S.W.3d 324, 330 (Tex. App.—Dallas 2004, no pet.)).

> Unlike conflicts of interest between jointly represented clients, the types of conflicts of interest which could give rise to a breach of fiduciary duty are those in which the lawyer has a direct pecuniary interest in the litigation that is adverse to the client, and the attorney pursues his own interest to the client's detriment.

*Riverwalk Cy Hotel Partners Ltd.*, 391 S.W.3d at 236 (citing *Beck*, 284 S.W.3d at 436).

Notably, "even if a complaint implicates a lawyer's fiduciary duties, it does not necessarily follow that such a complaint is actionable apart from a negligence claim."

7

*Pak*, 313 S.W.3d at 458. "Because a lawyer's 'standard of care in negligence claims is often defined by the characteristics of that inherent fiduciary relationship, . . . courts refer to the fiduciary relationship that the lawyer has to the client and use fiduciary standards to define the standard of care required of lawyers.'" *Beck*, 284 S.W.3d at 429 (quoting *Murphy*, 241 S.W.3d at 696). "Consequently, 'courts have most often applied those standards to conclude that the claims are really negligence, not breach-of-fiduciary-duty claims.'" *Id.* (quoting *Murphy*, 241 S.W.3d at 696)

### 2.     Analysis

In response to H&G's first issue, Jennifer states in her brief simply that her "claim was not for legal malpractice." She contends that she "proved deceptive conduct, which is not subject to the rule against fracturing professional negligence claims into multiple causes of action." She further asserts that "[s]he proved intentional conduct and self-dealing, each of which falls outside the anti-fracturing rule." Finally, Jennifer states that "[s]he challenged the integrity of the firm's billing practices, and that too falls outside the anti-fracturing rule."

After reviewing the record before us, we agree with H&G that the allegations upon which Jennifer relies to support her claims "do nothing more than recast her claims for professional negligence under alternative labels." *See Pak*, 313 S.W.3d at 458. Jennifer's claims are based on the following alleged acts and omissions by H&G: (1) filing the petition for writ of mandamus with respect to the disqualification order without advising Jennifer of the likely costs and delay that would result therefrom; (2) failing to advise that Harris's previous representation of Bob would be a problem in the

8

alimony enforcement suit; and (3) engaging in irregular and dishonest billing practices.[3] We will address each factual allegation in turn.

First, with respect to the mandamus petition, Jennifer's specific complaint is that Harris failed to adequately advise her of the costs and delay involved with pursuing that remedy and whether there were any viable alternatives. She contends that Harris's actions amounted to self-dealing because he stood to profit from the fees charged in connection with pursuing the mandamus. However, to the extent that Jennifer argues that H&G favored its own pecuniary interest in obtaining its legal fee over her interests, "that interest, without more, is insufficient to allege the type of dishonesty or intentional deception necessary to convert a negligence claim into one for breach of a fiduciary duty." *Pak*, 313 S.W.3d at 458; *see Beck*, 284 S.W.3d at 433; *Murphy*, 241 S.W.3d at 699; *see also Vara v. Williams*, No. 03-10-00861-CV, 2013 Tex. App. LEXIS 4051, at *12–13 n.4 (Tex. App.—Austin Mar. 28, 2013, no pet. h.) (mem. op.) ("The only benefit to [the attorney] that [the client] alleges is attorney's fees from continued representation of [the client]. Such an alleged benefit does not rise to the level of 'improper benefit' generally necessary to constitute a breach of fiduciary duty."). When an attorney charges an hourly rate for services, the attorney always stands to earn more if more work is performed, but that does not mean that an attorney potentially commits a breach of fiduciary duty every time he or she advises that additional work should be done on a case—whether it be to assert a new claim, to conduct additional research or discovery,

---

[3] H&G notes that Jennifer's live petition contained only one "Factual Background" section which was made applicable to all of her causes of action, including professional negligence. H&G argues that, because all the claims were based on the same facts, they must merely be "fractured negligence claims." But the fact that Jennifer's non-negligence causes of action relied on the same facts as her negligence claim is not dispositive of the central issue before us—i.e., whether the claims are essentially negligence claims or "more appropriately classified as another claim." *See Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 189 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

to seek appellate review of a trial court's ruling, or to undertake any other additional task—even if that advice is negligent. In other words, when an attorney negligently recommends additional work, the fact that the attorney is in a position to be compensated for that work is not itself indicative that the attorney "obtained an improper benefit from representing the client" so as to support a breach of fiduciary duty claim. *See Murphy*, 241 S.W.3d at 693; *see also Vara*, 2013 Tex. App. LEXIS 4051, at *12–13 n.4. In such a scenario, the *benefit* to the attorney is not improper, assuming the fee rate is objectively reasonable, because the attorney has done the work for which compensation is owed. On the other hand, the attorney's *advice* to the client to authorize the additional work may be actionable if the work was unreasonable or unnecessary. In particular, an attorney may be liable for pursuing an appeal of a disqualification order if that decision is contrary to the client's interest. *See Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 435 (1985) ("An attorney who is disqualified for misconduct may well have a personal interest in pursuing an immediate appeal, an interest which need not coincide with the interests of the client. As a matter of professional ethics, however, the decision to appeal should turn entirely on the client's interest."). But that decision would only form the basis of a professional negligence claim, not a breach of fiduciary duty, breach of contract, DTPA, or fraud claim.

Second, with respect to the potential conflict of interest, the evidence showed that Harris did not fail to disclose to Jennifer that he previously represented her ex-husband; rather, it showed that Harris failed to advise Jennifer that the potential conflict could present a problem in her alimony enforcement case. This allegation goes directly to Harris's ability to foresee the complications that would arise in the alimony

10

enforcement case as a result of his prior representation of Bob. In other words, it is an allegation that Harris "failed to exercise the degree of care, skill, or diligence that attorneys of ordinary skill and knowledge commonly possess." *See Riverwalk Cy Hotel Partners Ltd.*, 391 S.W.3d at 236. It forms the basis of a professional negligence claim, not a breach of fiduciary duty, breach of contract, DTPA, or fraud claim.

Finally, we address Jennifer's allegations with respect to H&G's billing practices. Jennifer specifically complains that Harris and H&G: (1) failed to adequately disclose their billing practices at the inception of the parties' agreement; (2) failed to abide by an allegedly agreed-upon "allocation of duties" between Harris and Simank; (3) hired Turner to serve as a testifying expert; (4) billed for attorneys' meals; (5) billed for letters written by attorneys; (6) provided inadequate fee statements; (7) failed to timely supplement fee statements with additional details; (8) used "benchmark" or "unit billing" practices; (9) billed for work done by assistants and paralegals; (10) billed for copies, faxes, and printing; and (11) billed for duplicate work done by Harris and Simank.

With the exception of the last allegation, which was conceded by H&G,[4] the essential nature of all of the billing complaints is that Harris provided inadequate legal representation to Jennifer by failing to properly inform, advise, and communicate to her the basis upon which fees would be charged. *See Pak*, 313 S.W.3d at 458. This conclusion is supported by the testimony of Jennifer and of Charlie Webb, an attorney who appeared at trial as an expert on Jennifer's behalf. When asked his opinion as to "the need for a written agreement between a client and an attorney," Webb replied:

> [I]t's very important that . . . the attorney and client have an agreement,
> and that both sides understand what the agreement is. It is so important

---

[4] As to the claim that H&G billed for duplicate work, H&G conceded that it had unintentionally overcharged $780 to Hilliard due to "computer error" and that this amount was, in fact, not due.

11

that the Supreme Court of Texas has said it's absolutely fundamental that the attorney have a clear agreement with his or her client from the outset, and that it's the burden of the lawyer to make sure that happens. It's not the client's obligation, it's the attorney's obligation to make sure that he or she has explained completely and specifically the terms of the agreement, so it's that important.

Webb stated that a communication of "what the attorney is going to do for the client" and "what the fee's gonna be" are examples of "fundamental" aspects of the attorney-client relationship which the attorney should ensure is understood by the client. Webb further stated:

[I]n the context of this case, typical hourly billing, certainly, the agreement should be clear from the outset as to who['s] going to do the work in the firm, how they're going to be billed. Will they be billed for all the time? Are there minimum blocks of fees that the firm charges? In other words, the client needs to know every time he or she calls in, are they gonna be subject to a charge, and is there a minimum charge for that. To me, that would be—at some point, that ought to be clarified along the way.

Webb stated that it is "not unusual" for attorneys from different firms to work together on a case, but that

Lawyers from different firms that would take it upon themselves to represent someone need to make sure that they understand what the allocation of duties is going to be, and that more important than that, that the client understand it. What's really important here in all of this, is that the lawyers make a really good effort to—to make sure that the client understands, not that they understand, that they can go do this, or that, that they know they can win the case, just get out of the way, client, we can win it. What the duty is, is that the lawyer put—make sure that he has empathy for where the client's coming from and understand and know that the client understands what, for instance, Mr. Simank's gonna do and what Mr. Harris is going to do, and if Mr. Greenwell's gonna participate, what he's going to do.

Webb explained that he reviewed the records in Jennifer's case, including her deposition transcript, and concluded that there was "[c]ause for concern." He interviewed Jennifer at her counsel's request. Jennifer claimed she "was billed with

12

long narrations of the work that was done, but no breakdown on who did it, and the amount of hours that went into it." He identified a bill dated March 31, 2005, that stated a total amount due of $16,392.50 but did not itemize hours or expenses and did not state the applicable hourly rate being charged.

When asked whether he had an opinion as to whether the fees charged by H&G were reasonable in this case, Webb replied: "I have an opinion that the relationship was not clearly and carefully spelled out."

Jennifer testified that, following the disqualification hearing, she met briefly with Harris and Simank, who told her that they were considering filing a mandamus petition to challenge the disqualification ruling. She later had a telephone conversation with Harris, in which Harris

> said that he and [Simank] have discussed this and looked over it and they feel like this is the way to proceed and it's very important that I send a message to [the trial court judge] that I'm not going to let him, you know, pick my lawyer and rule however he, you know, feels, and they felt like this was a very important step to take.

Subsequently, Harris sent a letter to Jennifer stating in part:

> I wanted to thank you for your support, patience and understanding in allowing our firm to pursue the mandamus. As you can appreciate, it was very important for us not to be branded with any type of unethical conduct which we believe [Bob] was attempting to do.
>
> We also believe that our victory in the Court of Appeals should be beneficial to you, not only from the standpoint of creating more respect in the mind of Bob Hilliard, but also creating more respect in the mind of the [trial court judge]. Although I believe that [the trial court judge] will be disposed to favor a fellow lawyer, [the trial court judge] hopefully will be more careful and analytical in the rulings that he makes in your case.

According to Jennifer, Harris advised her that the mandamus proceeding could take "[s]ix weeks to three months," but she did not ask how much the mandamus proceeding

13

would cost and Harris did not so advise her. She stated that, in hindsight, if Harris had advised her that the mandamus would have cost over $30,000 and taken nearly two years to complete, she would not have agreed to it.

Jennifer testified that she suffered many "sleepless nights worrying about what is going on" with her case and the bills charged by H&G. She claimed that she suffered headaches and stomachaches as a result of H&G's actions. Eventually, she raised her concerns at a lunch meeting with Simank and Harris on March 3, 2008. At the meeting, Jennifer informed the attorneys that her "resources and how we proceed with the case needs to be considered" because she "could not continue paying monthly bills like [the one pertaining to January 2008] and get this case to trial . . . ." According to Jennifer, Harris then told her that "you're just going to have to take whatever Bob is offering you, which is nothing, so you get nothing." Jennifer testified that this was the first time she had questioned Harris's judgment and she "felt like [she] had offended him in some way by questioning and letting them know that I was—needed to—we needed to make a change in how things were progressing."

Harris later sent Jennifer a letter, dated March 26, 2008, memorializing the meeting, which Jennifer contended was factually incorrect because it stated that her position was that she "did not want to spend any[ ]more money on attorney's fees." Jennifer objected to both the content of the letter and the fact that it was composed and sent at all, stating that she "felt this could have been handled with a phone call."

In response to Harris's March 26 letter, Jennifer sent an email to Harris and Simank stating, in part:

> My first response to the letter is regarding your recount of what I expressed that day over lunch. I did not say "I did not want to spend any

14

more money pursuing this case." I did say "I cannot keep paying the kind of bills you two are generating and still take this case to trail [sic]." My intent was to communicate the need for better management of the time expended on the case. I feel much time and much more of my resources have been wasted chasing bogus settlement agreements. The two years and 30K wasted because of [Harris]'s dismissal from the case, [Simank]'s many unapproved lunch meetings, phone calls and emails directly with Bob keeps me awake at night wondering if you are fully committed to protecting my interests. I have a great investment in this case with very little progress. My patience, my wallet and the tires on my car are wearing thin. That does not mean I am unwilling to go to trail [sic] and enforce my valid agreement. While personally I am fond of both of you and your families, I cannot let that be the reason for seriously damaging my financial position.

In her email, Jennifer also objected to Harris's hiring of Turner, the forensic accountant:

[Harris] brought in Scott Turner as a forensic accountant. I understand he is very expensive, especially since I was billed $450 for him to look at his schedule. I do not have an open checkbook to pay whatever he feels like billing. I have not agreed to his rate or what the cap on his services will be.

Finally, Jennifer's email set forth the following specific complaint about the attorneys' billing practices: "Your bills have no hourly amounts listed to any specific entry, only a lump amount of time at the bottom and total cost. I need to have the amount of time you spent on each entry and then the hourly rate applied to get the total cost of services rendered."

Harris, in turn, sent another letter to Jennifer addressing the issues raised in the email. In the letter, dated April 17, 2008, Harris explained that he believed that Bob was not being truthful with respect to his financial condition and that this was the reason he decided to hire Turner. Harris stated that he believed this action was within his authority, but he offered to subtract the $450 fee for Turner's consultation from Jennifer's bill. Harris claimed in the letter that he had "no problem" in providing more

specific billing and that Jennifer was welcome to come to his office to go over her account in detail. Finally, Harris stated:

> [T]he reality is that Bob Hilliard can make this as expensive as he wishes. We have absolutely no control over that. In addition, we can try the case and the Judge can enter a judgment against us; and just like the Motion to Disqualify, our only remedy may be through an appeal. This case could take years to resolve, over $100,000.00 in legal fees. And still, neither [Simank] nor myself could guarantee that you would be 100% successful.
>
> . . . .
>
> We took on this cause to vindicate your rights as a wife and a mother and to force Bob Hilliard to honor the sanctity of the written contract that he entered into with you and agreed to honor. I am still willing to proceed because I believe your cause is just and right. However, I cannot afford to try your case on a shoestring which could result in a loss which would be damaging to you and also to my reputation. I need your total commitment to this case. I need the help of Mr. Turner and Ron Simank. I am sure Mr. Simank needs the right to be able to communicate along settlement lines if the opportunity presents itself. If these rights are not granted, then I believe it would be best for you to obtain another lawyer to pursue this case. . . .

Harris requested that Jennifer reply within seven days to clarify the scope of his authority. Jennifer did reply with an email asking Harris and Simank whether they were aware that Scott Turner previously served as an accountant for Shelby Jordan, Bob's attorney in the alimony enforcement case. Harris replied that he did not know that, but that this fact did not change his recommendation to hire Turner for Jennifer's case.

With tensions rising, Harris sent to Jennifer a proposed motion to withdraw on May 1, 2008, noting that

> we do not believe that we can competently represent you if we do not have the authority to obtain the services of a forensic accountant to testify in the lawsuit and to take the time and expense in reviewing and copying Bob's business records so that we can analyze them.

16

Harris asked that Jennifer sign the motion to indicate her approval of his withdrawal, but she declined. Instead, she met again with Harris and Simank on May 7, 2008. At that meeting, Harris agreed to hire an alternative, less expensive accountant. In exchange, Jennifer agreed to pay $13,830.88, which was the amount of fees outstanding according to H&G's billing, by the end of that month. She also agreed to allow Harris and Simank to engage in further settlement negotiations. Jennifer and Bob subsequently entered into their settlement agreement.

When Jennifer failed to pay the $13,830.88 by the end of May 2008, Harris sent her another letter requesting payment. The letter included a summarized bill which only stated the total amount due and did not include an itemized list of charges. Jennifer requested such an itemized list, and Harris sent her detailed billing for the period beginning January 1, 2008. In response to the itemized bill, Jennifer emailed Harris stating:

> You continued to charge me for needless and unproductive meeting summary letters and then requested to withdraw as counsel—which you billed me for that too! Along with paying over $25,000 to clear your name, as you put it, the impropriety of hiring Scott Turner, I have been billed by both you and [Simank] for work on the same areas of work when we agreed that [Simank] would proceed with the settlement negotiations while you worked at getting the case to trial.
>
> As you know, [Bob] would not agree to reimburse me for your attorney fees as part of our settlement agreement, that combined with the $25K hickey I took for your disqualification and resulting Mandamus, I feel the $48,128.00 I have paid your firm is more than in excess of what is due. From the current due billing I have highlighted work or time spent on services I did not agree to,[5] were not your responsibility and/or feel were

---

[5] Jennifer highlighted the following entries in the itemized bill:

- 1/11/2008, 2.50 hours, $187.50, Prepare draft of Motion to Overrule Discovery Objections an[d] Motion to Compel; revise and finalize for filing with the Court; telephone conversation with Court Manager to obtain hearing date; telephone conference with Scott Turner to confirm availability of Scott Turner and Ron Simank's attendance at hearing; prepare Notice of Hearing; and "proposed" Order on Motion to Compel; cover letter to court via hand delivery for filing of same with copies to

17

Shelby Jordan, Ron Simank and client.

- 1/11/2008, 2.10 hours, $630.00, Telephone conference with Ron Simank, concerning motion to compel. Preparation of letter to Patsy Perez in reference to filing motion to compel and notice of hearing. Preparation of Notice of Hearing and Order. Telephone conference with Scott Turner in reference to availability to testify at motion to compel hearing.

- 1/21/2008, 0.60 hours, $180.00, Telephone conference with Scott Turner and telephone conference with Ron Simank in reference to forthcoming hearing on motion to compel.

- 1/22/2008, 2.10 hours, $630.00, Telephone conference with Ron Simank. Conference with Ron Simank in reference to settlement discussions with Shelby Jordan. Preparation for discovery conference with Shelby Jordan. Telephone conference with Scott Turner concerning need to testify at motion to compel.

- 1/30/2008, 2.00 hours, $170.00, Attendance at meeting with [Harris], Ron Simank and Shelby Jordan to discuss discovery dispute resolution and settlement discussions; preparation of draft Rule 11 agreement; preparation of draft Confidentiality Agreement and Protective Order and forward to Simank and [Harris] for review and approval; finalize and sent Rule 11 with Confidentiality agreement to Shelby Jordan; confer with Ron Simank regarding provisions in CA.

- 1/30/2008, 3.30 hours, $990.00, Receipt and review of Shelby Jordan's discovery proposal. Telephone conference with Ron Simank concerning same. Meeting with Shelby Jordan and Ron Simank in order to expedite discovery documents. Preparation of Rule 11 agreement passing hearing on motion to produce. Preparation of Rule 11 agreement covering discovery requests and preparation of confidentiality agreement. Telephone conference with Scott Turner in reference to cancellation of hearing.

- 2/13/2008, 0.30 hours, $90.00, Telephone conference with Ron Simank in reference to various e-mails from Shelby Jordan and attempt to consummate settlement agreement.

- 2/14/2008, 0.30 hours, $90.00, Telephone conference with Ron Simank regarding discussion as to settlement negotiations.

- 2/17/2008, 1.30 hours, $390.00, Reviewed and analyzed settlement agreement and annotated same for further discussion with Ron Simank. Preparation of e-mail to Jennifer Hilliard in order to meet on billings.

- 2/18/2008, 0.50 hours, $150.00, Meeting with Ron Simank to review proposed changes of settlement agreement.

- 2/28/2008, 0.50 hours, $150.00, Conference with Ron Simank and discussed new settlement agreement proposed by Shelby Jordan.

- 3/3/2008, 1.00 hour, $300.00, Conference with client. Legal research in reference to enforceability of Rule 11 agreement and prerequisites to enforcing one in order to become a judgment.

- 3/26/2008, 0.50 hours, $150.00, Preparation of letter to Jennifer Hilliard requesting authority to proceed.

- 4/16/2008, 0.50 hours, $150.00, Preparation of draft letter to Jennifer Hilliard; submit same to Ron

Simank for review.

- 4/16/2008, 0.25 hours, $21.25, Preparation of draft letter to Jennifer Hilliard.

- 4/17/2008, 0.25 hours, $21.25, Finalize draft of letter to Jennifer Hilliard; mail to client with copy hand delivered to Ron Simank.

- 4/24/2008, 0.50 hours, $150.00, Preparation of letter to Jennifer Hilliard requesting authority to proceed.

- 4/24/2008, 0.50 hours, $42.50, Preparation of letter to Jennifer Hilliard under Mr. Harris' instructions; scan letter to director; forward letter to Jennifer Hilliard by e-mail with copy to Ron Simank.

- 4/30/2008, 1.50 hours, $127.50, Preparation of Motion to Withdraw, Order, draft letter to Jennifer Hilliard enclosing Motion to Withdraw.

- 5/1/2008, 0.50 hours, $150.00, Letter to Jennifer Hilliard requesting she sign enclosed Motion to Withdraw.

- 5/6/2008, 0.30 hours, $90.00, Telephone conference with Ron Simank concerning meeting with Jennifer Hilliard for the purpose of determining future actions to take.

- 5/8/2008, 0.50 hours, $150.00, Preparation of letter to Jennifer Hilliard outlining decisions made at the meeting between Hilliard and her attorneys.

- 5/22/2008, 0.25 hours, $90.00, Preparation of email to Jennifer Hilliard.

- 5/22/2008, 0.25 hours, $21.25, Assist Mr. Harris in preparation of e-mail to Jennifer Hilliard.

- 5/23/2008, 0.25 hours, $21.25, Assist Mr. Harris with response to e-mail Jennifer Hilliard.

- 6/4/2008, 0.50 hours, $150.00, Letter to Jennifer Hilliard requesting approval to enter into settlement discussions.

- 6/9/2008, 0.30 hours, $90.00, Conference with Ron Simank in reference to steps to take to finalize settlement between Bob Hilliard and Jennifer Hilliard.

- 6/10/2008, 0.30 hours, $90.00, Telephone conference with Ron Simank in reference to request to review settlement agreement.

- 6/11/2008, 2.30 hours, $690.00, Telephone conference with Ron Simank; review and analysis of Settlement Agreement, Agreed Judgment and Confidentiality Agreement.

- 6/13/2008, 0.30 hours, $90.00, Telephone conference with Ron Simank in reference to difficulties in finalizing judgment with Shelby Jordan and Bob Hilliard.

- 2/12/2008, $440.00, Consulting Services (275) W. Scott Turner & Company, PC Review of records and conferences with Mr. Harris.

19

unnecessary. After subtracting those items from the $13,830.88 outstanding, the maximum amount I feel is due is $6,819.63.

H&G rejected Jennifer's offer to pay the reduced amount and instead filed suit.

Having reviewed the record, we conclude that Jennifer's allegations regarding fees each involve the question of whether Harris failed to exercise the degree of care, skill, or diligence in performing his duty as counsel. The evidence showed that the fees disputed by Jennifer were assessed for ordinary legal services such as drafting emails and letters, drafting motions, reviewing settlement proposals, consulting with co-counsel, consulting with opposing counsel, and consulting with a potential expert witness. There appears to be no dispute that, given the amount of work performed by H&G, the fees charged were reasonable.[6] Moreover, while there was certainly evidence adduced calling into question whether the performance of certain tasks was reasonable or necessary, neither Jennifer's pleadings nor the trial evidence supports a conclusion that Harris or any of his colleagues undertook the performance of unnecessary services with the intent to obtain a improper pecuniary benefit. *See Pak*, 313 S.W.3d at 458 (noting that an attorney's pecuniary interest in obtaining a legal fee is "insufficient to allege the type of dishonesty or intentional deception" necessary support a breach of fiduciary duty claim); *Beck*, 284 S.W.3d at 433 ("We disagree that the mere fact the [attorney defendants] might have had an expectation of fees from continuing to represent [the plaintiff]—a factor present in virtually every attorney-client relationship—can convert [the plaintiff's] negligence claim into breach-of-fiduciary-duty claim."). Instead, the dispute regarding the fees charged by H&G involves Harris's

_____

[6] Jennifer has cited no case law, and we have located none, establishing that a law firm's use of "benchmark" or "unit billing" may support a breach of fiduciary duty, breach of contract, fraud, or DTPA claim.

20

failure to communicate to Jennifer the precise basis upon which fees would be charged. This complaint sounds in negligence and not breach of fiduciary duty, breach of contract, DTPA, or fraud.[7]

Our conclusion is consistent with cases in which an attorney's failure to disclose information to the client served as the basis for the client's non-negligence claims. For example, in *Pak v. Harris*, the plaintiff client alleged that his attorney breached his fiduciary duty by failing to disclose the existence of an email sent by another of the attorney's clients which may have given rise to a conflict of interest. 313 S.W.3d at 457–58. The client also contended that the attorney "aided and abetted the fraud" of the other client by, among other things, failing to disclose the existence of the email. *Id.* at 458. The Dallas Court of Appeals concluded that the breach of fiduciary claim merely recast the client's negligence claim under an alternative label. *Id.* The client's allegations, although couched in terms of fraud, actually

> involve the question of whether [the attorney] failed to exercise the degree of care, skill, or diligence in performing his duty to inform [the plaintiff] about issues that could arise during the representation of multiple clients and his duty to communicate with and among the clients he represented in this matter.

*Id.*

---

[7] H&G cites a federal bankruptcy case suggesting that a fee dispute cannot form the basis of a breach of fiduciary duty claim. *See Turoff v. Walker (In re Precept Business Servs.)*, No. 01-31351-SAF-7, 2004 Bankr. LEXIS 1237, at *32 (Bankr. N.D. Tex. Aug. 23, 2004) (mem. op. & order) ("Billing disagreements connote contract disputes, not fiduciary disputes."). H&G also cites a South Dakota Supreme Court case suggesting that the failure of an attorney to comply with ethical disclosure requirements does not implicate a breach of the attorney's fiduciary duties. *See Behrens v. Widmore*, 698 N.W.2d 555, 576–77 (S.D. 2005) (citing 2 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 14.5 at 537 (5th ed 2000) ("[A]lthough the attorney functions in a fiduciary relationship, a wrong by an attorney does not thereby become a fiduciary breach. . . . The courts have recognized that claims of negligence, which do not implicate a duty of confidentiality or loyalty, do not support a cause of action for fiduciary breach.")). We do not approve or disapprove these suggestions but merely hold that the facts alleged and proved in this particular case are properly characterized as professional negligence claims.

In *Vara v. Williams*, 2013 Tex. App. LEXIS 4051, at *10–11, the plaintiff client alleged that her attorney made "false, misleading, and deceptive" representations regarding the drafting of a trust agreement and divorce decree, "concealed" information concerning the agreement and verification of her ex-husband's assets, and "induced" her into signing the divorce decree. The Austin Court of Appeals concluded that, because the substance of these allegations is that the attorney did not fulfill her duties, the plaintiff's fraud, breach of fiduciary duty, and DTPA claims were merely fractured negligence claims and therefore properly dismissed by summary judgment. *Id.* at *11–12.

In *Smith v. Aldridge*, No. 14-11-00673-CV, 2012 Tex. App. LEXIS 2499, at *16–17 (Tex. App.—Houston [14th Dist.] Mar. 29, 2012, pet. denied) (mem. op.), the plaintiff client asserted that his attorney made fraudulent misrepresentations when he "said that he would not settle [the client's] case without gaining [the client's] prior approval" and "that he was actively preparing for trial after initial settlement demands had been rejected." The plaintiff also claimed the attorney breached his fiduciary duty by failing to "forward legal documents to [the client], which kept [the client] misinformed about the status of his case." *Id.* at *14. The court held that the rule against fracturing barred the fraud and breach of fiduciary duty claims, because the complaints "all generally assail the adequacy of [the attorney's] representation." *Id.* at *15.

In *Isaacs v. Schleier*, 356 S.W.3d 548, 559 (Tex. App.—Texarkana 2011, pet. denied), the plaintiffs alleged that their attorney committed breach of contract, breach of fiduciary duty, and violations of the DTPA by, among other things: failing to "follow clear and lawful instructions" of the client; "not following instructions regarding terms to be

included in [a] promissory note"; "undertaking to represent the naturally conflicting interests of both parties"; and "failing to obtain informed consent of the [clients] before undertaking any adverse representation." The Texarkana Court of Appeals held that all of these allegations "can be characterized as legal negligence." *Id.* at 560.

We do not believe, as Jennifer urges, that her claims cannot be properly classified as professional negligence claims merely because she alleges that H&G acted intentionally. For example, in *Meullion v. Gladden*, No. 14-10-01143-CV, 2011 Tex. App. LEXIS 9334, at *21 (Tex. App.—Houston [14th Dist.] Nov. 29, 2011, no pet.) (mem. op.), the plaintiff client asserted that his attorney "promised to draft an application that would obtain habeas relief" but that he "instead drafted an application that [the attorney] 'knew would fail.'" The Fourteenth Court of Appeals held that, even though the plaintiff asserted that the attorney acted intentionally, the "claims for alleged fraud, breach of fiduciary duty, and breach of contract are merely relabeled claims for professional negligence because they assail the adequacy of [the attorney's] performance in connection with the preparation of the application for writ of habeas corpus." *Id.* at *13; *but see Sullivan v. Bickel & Brewer*, 943 S.W.2d 477, 483 (Tex. App.—Dallas 1995, writ denied) (concluding that plaintiff's allegation that defendant law firm "provided legal services in a manner intended to fraudulently lengthen the duration and increase the scope of litigation to increase their billings" was properly characterized as a fraud claim).[8]

---

[8] In *Sullivan*, the Dallas Court of Appeals cited this Court's opinion in *Estate of Degley v. Vega*, 797 S.W.2d 299, 303 (Tex. App.—Corpus Christi 1990, no writ), for the proposition that there is "a distinction between an action for negligent legal practice and one for fraud relating to fees for legal services" such that the latter may give rise to a non-negligence claim. *See Sullivan v. Bickel & Brewer*, 943 S.W.2d 477, 483 (Tex. App.—Dallas 1995, writ denied). However, in *Vega*, we did not explicitly consider whether the plaintiff's fraud claim was barred due to the rule against fracturing. *See* 797 S.W.2d at 303. Instead, the issue before us was whether the fraud claim was barred by the two-year statute of

23

Because Jennifer's breach of contract, breach of fiduciary duty, DTPA and fraud claims merely restate her professional negligence claims, we conclude the trial court erred in denying H&G's motion for entry of judgment. H&G's first issue is sustained.[9]

## B. Quantum Meruit and Breach of Contract

By its sixteenth issue, H&G contends that the trial court erred in refusing to award judgment to H&G based on its quantum meruit claim.

Under the equitable theory of quantum meruit, one who provides valuable services to another may establish that the service's recipient has an implied-in-law obligation to pay when the recipient has reasonable notice that the service provider expects to be paid. *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008); *Vortt Exploration v. Chevron U.S.A.*, 787 S.W.2d 942, 944 (Tex. 1990). To recover under quantum meruit, a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged. *Vortt Exploration Co.*, 787 S.W.2d at 944; *see PIC Realty Corp. v. Southfield Farms, Inc.*, 832

limitations applicable to personal injury cases. *Id.* We held that it was not, and instead applied the four-year statute of limitations then applicable to "actions for debt." *Id.* Accordingly, we do not believe that *Vega* supports the proposition that intentional conduct by an attorney must necessarily give rise to a non-negligence cause of action.

[9] Because of our disposition as to this issue, we need not address: H&G's second and third issues, contending that the jury charge as to breach of fiduciary duty was erroneous; its tenth and eleventh issues, contending that the evidence was insufficient to support the jury's breach of fiduciary duty findings; its twelfth issue, contending that the evidence was insufficient to support the jury's finding that H&G breached its contract with Jennifer; its eighth and thirteenth issues, challenging the jury's findings as to DTPA violations; its fourteenth issue, challenging the fraud verdict; its fourth through seventh issues, addressing the propriety of fee forfeiture as a remedy; or its ninth and fifteenth issues, addressing the trial court's award of attorney's fees to Jennifer. *See* TEX. R. APP. P. 47.1.

S.W.2d 610, 612 (Tex. App.—Corpus Christi 1992, no writ); *see also Senegal v. Hardeman*, No. 13-11-00659-CV, 2012 Tex. App. LEXIS 9105, at *6–7 (Tex. App.—Corpus Christi Nov. 1, 2012, no pet.) (mem. op.). Quantum meruit is applicable where no express contract exists between the parties. *Concept Gen. Contr., Inc. v. Asbestos Maint. Servs.*, 346 S.W.3d 172, 185 (Tex. App.—Amarillo 2011, pet. denied).

As noted, the jury found that H&G had performed "compensable work" for Jennifer worth $9,723.88 between January 3, 2008 and June 25, 2008. The trial court disregarded that finding, however, in fashioning the judgment on appeal. The trial court's conclusions of law stated, in relevant part, as follows:

1. [H&G] cannot recover under a quantum meruit claim because an express contract covered the services that were the subject of that claim.

2. [H&G] did not do equity and has not come into court with clean hands.

3. Because H&G did not do equity and has not come into court with clean hands, quantum meruit relief is denied to [H&G].

4. Jennifer Hilliard would not be unjustly enriched, and [H&G] would not be unjustly penalized, by a denial of quantum meruit relief to [H&G].

5. Because Jennifer Hilliard would not be unjustly enriched, and [H&G] would not unjustly penalized, by a denial of quantum meruit relief, such relief is denied to [H&G].

6. A quantum meruit award to [H&G] would not be equitable and just, and accordingly such relief is denied.

On appeal, H&G argues that the trial court's conclusion that H&G "has not come into court with clean hands"[10] cannot support the trial court's rejection of quantum meruit

---

[10] A party seeking an equitable remedy, such as quantum meruit, must come to court with "clean hands." *In re Gamble*, 71 S.W.3d 313, 325 (Tex. 2002) (Baker, J., concurring); *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988); *Omohundro v. Matthews*, 161 Tex. 367, 381, 341 S.W.2d 401, 410 (1960). The clean hands doctrine requires that "one who seeks equity, does equity"; it provides that equitable relief is not warranted when the plaintiff has engaged in unconscionable, unjust, or inequitable conduct

relief because Jennifer did not plead "clean hands" as a defense. See *Adams v. First Nat'l Bank of Bells/Savoy*, 154 S.W.3d 859, 866 (Tex. App.—Dallas 2005, no pet.) (noting that "lack of clean hands" is an affirmative defense); *see also* TEX. R. CIV. P. 94 (stating that affirmative defenses must be pled). However, it does not address the other grounds set forth by the trial court for denying quantum meruit relief. In particular, H&G does not address the trial court's conclusion that an express contract covered the services that were the subject of H&G's quantum meruit claim. Because this conclusion was supported by the evidence adduced at trial,[11] we cannot say that the trial court erred in denying quantum meruit relief. H&G's sixteenth issue is overruled.

By its seventeenth and eighteenth issues, H&G argues that the trial court erred in failing to award judgment notwithstanding the verdict on its breach of contract claim and that the evidence was legally and factually insufficient to support the jury's finding that Jennifer did not breach her contract with H&G. However, H&G does not support these issues with argument or references to authority. The issues are therefore waived. *See* TEX. R. APP. P. 38.1(i).

---

with regard to the issue in dispute. *In re Francis*, 186 S.W.3d 534, 551 (Tex. 2006); *Thomas v. McNair*, 882 S.W.2d 870, 880 (Tex. App.—Corpus Christi 1994, no writ).

[11] We have previously concluded, in our discussion of H&G's first issue, that Jennifer's breach of contract claim was more appropriately characterized as a professional negligence claim. But that conclusion does not imply that there was no express contract between H&G and Jennifer. Accordingly, that conclusion is consistent with our finding, in our discussion of H&G's sixteenth issue, that the trial court's denial of quantum meruit relief was supported by evidence showing that an express contract did, in fact, exist.

26

### III. Conclusion

We reverse those portions of the trial court's judgment awarding relief to Jennifer and render judgment that she take nothing by way of her counterclaims against H&G. The remainder of the trial court's judgment is affirmed.

 /s/ Dori Contreras Garza
DORI CONTRERAS GARZA,
Justice

Delivered and filed the
1st day of August, 2013.

27